[No. 1431.]

# EDWARD WILLS, APPELLANT, v. THE BANK OF NEVADA, A CORPORATION, RESPONDENT.

STATUTE OF FRAUDS—ORIGINAL UNDERTAKING.—Where there was an agreement between defendant bank and a dealer in hay, whereby the bank was to collect for the sales of hay, and from the proceeds pay checks given by the dealer for the purchase price thereof, and such agreement was communicated by the bank to plaintiff, who, relying thereon, sold hay to said dealer, the transaction was not within the statute of frauds, as a verbal promise to answer for the debt of another.

VARIANCE—QUESTIONS RAISED FOR FIRST TIME IN APPELLATE COURT.—Questions as to variance between the allegations of the complaint and the proofs cannot be raised in the appellate court, when they were not raised at the trial, if an amendment could have been properly made to meet the objections.

APPEAL from the District Court of the State of Nevada, Washoe county; A. E. Cheney, District Judge:

Action by Edward Wills against the Bank of Nevada for goods sold and delivered. Defendant had judgment, and plaintiff appeals. Reversed.

The facts sufficiently appear in the opinion.

*Alfred Chartz*, for Appellant:

I.   This was an original promise, because the sole credit was given to the bank, and the promisee had the right to give the sole credit to the bank instead of the bankrupt, and the promise of the bank amounted to a virtual purchase, there being no pre-existing liability between Mayberry and Wills, and Wills having refused to trust Mayberry, and being so poor that he could not afford to trust him and having charged the account directly to respondent. (*Maubrey* v. *Cunningham*, note 3, p. 202, Wood on Statute of Frauds.)

II.   The attendant circumstances, the situation and general responsibility of the promisor may be considered. (*Anderson* v. *Hayman*, 1 H. Bl. 120; *Keate* v. *Temple*, 1 B. & P. 158; Wood on Frauds, secs. 98–100.)

III.   An unconditional promise to pay for goods to be furnished to another is not within the statute. (*Morrison* v. *Baker*, 81 N. C. 76; Wood on Frauds, sec. 128; *Gordon* v. *Martin*, Fitzg. 302; *Mackay* v. *Smith*, 28 Pac. 974.)

In *Austen* v. *Baker*, Lord Holt said that if B desired A to deliver goods to C, and promises to see him paid, there assumpset lies against B. (Wood on Frauds, sec. 131; *Talman* v. *Rochester City Bank*, 18 Barb. (N. Y.) 123; 13 John. (N. Y.) 175; *Sinclair* v. *Bradley*, 52 Mo. 180; *Hodges* v. *Hall*, 29 Vt. 209; 9 Ency. of Law, 72.)

IV. When the promisor makes the promise with an object of profit to himself, it is not within the statute. (*Nelson* v. *Boynton*, 3 Metc. (Mass.) 396; *Alger* v. *Scoville*, 1 Gray (Mass.) 391; *Belknap* v. *Bender*, 75 N. Y. 446; Wood on Frauds, 264, note 2; 29 Vt. 23; 21 N. Y. 422, 418; 17 Pac. 887; 43 Mo. App. 139; 50 (Mich.) N. W. 305; 58 Am. Digest, 1892, sec. 36; 37 Am. Rep. 612; 33 Me. 368; 35 Mich. 320; Wood on Frauds, sec. 98; 56 N. Y. 334.)

V. If evidence is offered by plaintiff at variance with the allegations of the complaint, and the counsel for the defense does not object to it at the time, nor move to strike it out upon the grounds of variance, the error is waived. (Estee on Pl., 122; *Bell* v. *Knowles*, 45 Cal. 193; 25 Cal. 472; 25 Cal. 619.)

*Torreyson & Summerfield*, for Respondent:

I. Neither the verdict of the jury nor the findings of fact of a judge, which in this case are all implied, which are necessary to sustain the judgment, will be disturbed by the appellate court if there is a material conflict in the evidence and there is substantial testimony to support it or them. The same well-established doctrine applies to orders granting or overruling motions for new trials when made upon the alleged insufficiency of evidence. (*Edwards* v. *Carson Water Co.*, 21 Nev. 492; *Blackie* v. *Cooney*, 8 Nev. 41; *Klopper* v. *Levy*, 98 Cal. 525.)

II. Appellant fails to distinguish between mere "variance" and the well-established rule of law that "the *allegata* and *probata* must correspond." While it is no doubt the law that a mere variance between pleadings and proof will be disregarded unless objection was opportunely made to the admission of the evidence or a motion for non-suit was seasonably made, yet this rule of law has never been held to extend so far as to relieve a plaintiff from the necessity of

proving the essential allegations of his complaint when they are denied by the answer. To hold otherwise would be to destroy the necessity of pleadings altogether. (*Wheeler* v. *Schad*, 7 Nev. 204; *James* v. *Goodenough*, 7 Nev. 324; *Stout* v. *Coffin*, 28 Cal. 65; Estee's Pleadings, 3d ed., vol. 1, par. 205.)

III.   Appellant and Mayberry, his principal witness, both testified in effect that respondent became security for the payment of the hay by Mayberry. It is not claimed that its promise was in writing. If our statute of frauds means anything at all it precludes appellant from recovering upon such testimony.

By the Court, BONNIFIELD, J.:

This action was brought by the appellant as plaintiff against the respondent as defendant in the District Court of the Second Judicial District, in and for Washoe county, to recover the sum of $642 50, balance due for hay sold by plaintiff to the defendant and delivered to James Mayberry at the defendant's request, as alleged in the complaint. The answer consists of specific denials of the allegations of the complaint. The case was tried by the court sitting without a jury. The court dismissed the action and gave the defendant judgment for its costs. The plaintiff moved for a new trial, designating in his notice of motion as one of the grounds the "insufficiency of the evidence to justify the decision made by said court and the judgment entered in the action," and in his statement on motion for new trial he specifies several particulars in which he claims the evidence is insufficient to justify the decision. His motion was denied. This appeal is taken from the judgment and the order of the court denying a new trial. The court filed no findings of fact. No question was raised by counsel for the defendant in the court below as to any variance between the allegations of the complaint and the proofs, and no variance was suggested by the court until the time of its oral decision of the case, and then the case was not decided on that ground, but it was based on the ground, in effect, that the promise of the defendant to the plaintiff was a verbal promise to answer for the debt of Mayberry, and was within the statute of frauds. As we have come to a different conclusion from the court

below, from the evidence in the case, we here give the material portions of the testimony of the plaintiff and James Mayberry and all the testimony of M. O. Ward, taken from the record, to wit:

The plaintiff testified that in November, 1891, James Mayberry came to him to purchase his hay, and said he would buy the hay if it suited him; that he went, looked at the hay and returned to plaintiff's house and plaintiff asked him about the pay; that Mayberry said that he would give him a check on the Bank of Nevada, and the bank would pay it in thirty days; that the plaintiff need not take his word for it, but he could go and see Mr. Ward; that the plaintiff went and saw Mr. Ward, and told him what Mayberry said; that Ward said: "Get Mayberry's checks and in thirty days the bank would cash them"; that the bank paid the first and second checks; "that the second check was paid before the time was up, but payment of the third and last check was refused."

Mayberry testified, in substance, that he was indebted to the bank; that he went to the bank primarily to make arrangements with it to enable him to buy hay, and did make such arrangements; that his arrangements were: That as soon as the hay he purchased was delivered on the cars he would give to his several vendors checks on the bank for the price of the hay bought, payable in thirty days, and deliver to the bank the shipping receipts for the hay he shipped for it, to collect for his sales and to pay his said several checks, the profits to be applied on his debt to the bank; that he bought and sold hay from different parties and deposited the shipping receipts with the bank; that all the returns for the sales of the hay were made to the bank; that it collected for all the sales of the hay and collected for the sale of the Wills hay and paid for all the hay except the last check presented by the plaintiff; that when he went to buy the plaintiff's hay the plaintiff asked him "What about the pay?" that he told the plaintiff "to go to the bank and see if everything is all right"; that he could not have bought hay if the bank had not obligated itself to pay his checks; that he could not have bought the plaintiff's hay if the bank

had not promised to pay his checks for it, for the plaintiff refused to let him have it.

He also testified "that the checks given on the bank payable in thirty days gave time for the returns to come in for the hay," and also "that the hay business was profitable, and the bank made it all; that he owed the bank less at the end of his hay operations than he did at the beginning."

Mr. Ward testified that he was vice-president of the corporation defendant.

By Summerfield:   Q.—Did Mayberry have but one agreement with the bank with regard to the purchase of hay? A.—Mayberry wanted the bank to guarantee the payment of his checks.   I was a director in the board and was vice-president also, and I was a worker in the bank.

Q.—Do you know of any transactions between Mayberry and Wills, the plaintiff in this case, and the bank relative to hay purchases from Wills?   A.—Yes, sir.

Q.—State to the court what arrangements existed between the Bank of Nevada and Wills and Mayberry with regard to such transactions.   A.—Mayberry wanted to purchase hay, and he wanted the bank to guarantee his checks that he might be able to purchase hay.

Q.—Did you have but one agreement—did the bank have but one agreement with Mayberry about the purchase of hay? A.—Only one.

Q.—State what that agreement was.   A.—Osburn and myself, as cashier of the bank, acting under the board of directors, upon the receipt of the shipping receipts, after the hay was baled and on board of the cars to guarantee the payment of Mayberry's checks in thirty days from the time the checks were accepted by us, under the expectation that the money from the sales of the hay would be returned to the bank within thirty days' time after the receipt of the shipping receipts, but we always credited all receipts of money to Mayberry's account.

Q.—That was the agreement and that was the order that you worked under?   A.—Yes, sir.   The bank was to guarantee the payment of checks given by Mayberry when the shipping receipts were in and the checks were accepted by us, within thirty days from that time.

Q.—Do you remember the transaction with Wills? A.—I remember it in a general way, on account of the business at the time.

Q.—State what you remember about the payment of the first check testified to here. A.—The check was presented and guaranteed and in thirty days it was paid.

Q.—Did the shipping receipt accompany it? A.—Wills came into the bank when the second check was paid and the cashier was inside and I was outside, and I heard him say to Osburn: " I have a check from Mayberry for hay; when will it be paid?" and Osburn said, " we will pay it now," and it was paid.

In this connection witness testified that Osburn acted contrary to the order of the board of directors in paying that check before due. Direct examination resumed by Summerfield: Q.—Have you made a careful examination of the books of the bank with reference to that payment in order to refresh your recollection? A.—I have.

Q.—Do you remember any further conversation with Wills about the hay? A.—Yes, sir. I remember that Wills informed me later on that his had all been paid for and that there was more hay that he had on hand, and I said to him to be careful, that Mayberry's account was not good at the bank, and I remember distinctly that he said he had got paid for the other, and he would take chances on this. The bank had no account with Wills. The returns were credited to Mayberry.

Q.—Do you remember the conversation with Wills at the depot where he testified that you told him not to let Mayberry have any more hay? A.—I thought the conversation was at the bank. I spoke to him a time or two. He had told me that part of the hay was still in his possession, and I suggested to him he had better keep it, that Mayberry's account was not good, and I said that a loaf was better than no bread, and he said he would take chances; and I remember telling Wills that some hay in California had not been paid and that the money had not been remitted.

On cross-examination Mr. Ward testified that his best recollection was that Wills came in the bank and asked about the hay, and he told Wills when the hay was baled and on

board the cars and the shipping receipts were in, that Wills should bring in a check from Mayberry for a corresponding amount and the bank would pay it in thirty days after it was accepted.

Q.—Have you any independent recollection of the words you used to Wills and the words used by Wills to you at the time Wills went to the bank first about selling his hay? Is not your recollection a general recollection of the promises that you made different people? .

This question was repeated many, many times, and witness finally answered as follows:

A.—I simply reiterated to Wills the directions I had from the board. I tried to follow the directions of the board as close as I could.

Q.—Do you give your independent recollection of what you said to Wills at the time the promise was made? A.— That is my recollection that I told Wills those were my instructions from the board, but I don't know that I used those words.

Q.—My question is, have you any independent recollection of what you said to Wills at that time? A.—That is my recollection, because that was my instructions.

By Summerfield: Q.—At the time that Wills first went to the bank was the conversation in the presence of any one? A.—I think Mr. Osburn was there.

With regard to the payment of the second check Mr. Ward testified that if Mr. Osburn had obeyed the order of the board of directors it would have been better for the bank.

Upon being recalled for further cross-examination, Mr. Ward was asked: Q.—What induced you to tell Wills at the railroad depot in Reno not to let Mayberry have any more hay? A.—I don't know as I told him not to let Mayberry have any more hay.

Q.—What was your object in making Wills whatever promises you may have made to him? Was it for your own personal aggrandizement, or was it to subserve the interests of the bank? A.—It was for the bank.

Counsel for appellant urges several grounds upon either of which he claims that the right of the plaintiff to maintain this action may be based under the evidence. We do not

deem it necessary to pass on more than one of them, and thus we will avoid entering the labyrinth of conflicting decisions on the statute of frauds, from which it seems no court and no law writer ever emerged with satisfaction as to the rules therein laid down.

Taking the testimony of M. E. Ward, the principal actor for the bank, under the directions of the board of directors, and considering the several agreements developed by his evidence in a business light, and as transactions between business men, the fair and reasonable construction of his evidence is, that the bank agreed with James Mayberry that when he bought hay, and it was delivered to him on the cars, he should give the vendors his check on the bank, payable in thirty days, for the amount of the price of the hay so delivered, and deliver to the bank the shipping receipts for the hay shipped by him, and the bank would collect for the sales of the hay, and pay Mayberry's vendors the several checks he issued to them for the hay, out of the proceeds of the sales, under the expectation that the returns from the sales of the hay would be made to the bank within thirty days from such shipment; and that Ward informed the plaintiff, in substance, of said agreement of the bank with Mayberry, and agreed with the plaintiff when his hay was baled and delivered on the cars he should bring in a check from Mayberry for a corresponding amount and the bank would cash it in thirty days.

Now, the substance of the agreement on the part of Mayberry with the plaintiff was, that when the hay was delivered on the cars he would give the plaintiff a check, for the price of the hay, on the Bank of Nevada, payable in thirty days, and that the bank would pay it when due. Mayberry's promise was not that he would collect for the sales of the hay and pay the checks out of the proceeds. This is what the bank agreed to do, according to the testimony of both Mayberry and Ward. This was an original undertaking on the part of the bank, and not collateral to the promise of Mayberry. Mayberry did not assume, nor was he liable in the first instance, to do what the bank promised to do. His legal obligation which existed as a legal incident to his agreement with the plaintiff was to pay the check if the bank

made default in its payment.   In contemplation of law Mayberry was guarantor for the bank; his obligation was to pay the check upon the bank's failure of payment.   His legal obligation was also to have funds in the hands of the bank to meet the payment of the check when due; and his uncontradicted evidence, in this respect, is that he did so have the funds there.    He testified that he deposited the shipping receipts at the bank for them to collect for the hay, and that the bank did collect for the hay, and collected for Wills' hay, and paid for all the hay, except the check presented last by Wills.   He also testified, that all the returns from the sales of the hay were made to the bank.

R. S. Osburn, the cashier of the bank, testified "that Mayberry ran the business in such ambiguous way that nobody could tell head or tail where the money came from; that no shipping receipts were ever left with the bank and the bank finally quit."

It is not denied, however, on the part of the defendant that the returns from the sales of the hay were made to it, or that it collected the money, the bank having collected the money, we regard the non-delivery of the shipping receipts as being immaterial, and we cannot perceive how the "ambiguous manner Mayberry ran the business" could relieve the defendant of its obligations to pay the money it received for the sale of the Wills hay to the plaintiff on his check.

This case, under the above state of facts, comes within the third class of cases considered by Browne in his work on the Statute of Frauds, and also by Wood on the same subject.    Browne, at page 258, says:   "To a third class belongs the cases in which the property of the third party is put into the hands of the defendant for the purpose of paying out of the proceeds thereof, the third party's debt to the plaintiff.   These are cases of obligation by the defendant, as a trustee, to make such payment, and it is that personal obligation which the plaintiff seeks to enforce, and his right of action is not affected by the statute."

In note 1, p. 259, he cites *Fullman* v. *Adams*, 37 Vt. 397, as a case giving "one of the most intelligent and instructive opinions that have ever been delivered upon the subject of guaranties under the statute of frauds."

In the Vermont case the soundness of the rule is recognized, that a verbal promise to pay the debt of another, where the promisor has received the funds or property of the debtor for the purpose of being so applied, so that an obligation or duty rests upon him, as between himself and the debtor to make such payment, though in form a promise to pay the debt of another, it is in fact a promise to perform an obligation or duty of his own, and is not within the statute.

Chief Justice Poland, in his opinion, says: "And where a debtor transfers funds or property to another for the purpose of paying his debt, and the person thus holding the funds or property promises the creditor to pay his debt, such promise is held good, though not in writing." And he says: "We apprehend the true principle why the promise to the creditor is valid without writing is the party making the promise holds the funds of the debtor for the purpose of paying his debt, and as between him and the debtor it his duty to pay the debt, so that when he promises the creditor to pay it, in substance he promises to pay his own debt, and not that of another, and though the debtor still remains liable for his own debt, his relation is rather that of a surety for the party whose duty it is and who has promised to pay his debt, that of a principal for whom the other has become surety or guarantor. He holds a fund in trust, under a duty to pay it to the creditor, and he makes an express promise to perform it. In such case it is no violation of the spirit of the statute to hold such promise an original one and not necessary to be in writing."

Wood on Statute of Frauds, sec. 144, says: "Where the promisor has funds in his hands belonging to the debtor, from which he has authority to pay a certain debt, the promise is not within the statute, because it is a promise merely to pay to the creditor what he would otherwise be bound to pay to the debtor in satisfaction of his own debt; and the same is true where the promise is conditional, as to pay if he receives funds of the debtor to the amount of the debt. In such case, while there is no obligation to pay unless the condition is fulfilled, yet, if the condition is fulfilled, the promise is operative and not within the statute, because the debtor's own funds are relied upon for payment." In support of the

above rules the author cites many authorities. "If one deliver money or personal property to another, under the promise of the latter to deliver it over to a third person who has a beneficial interest therein, or to convert it into money and pay him the proceeds, the third party can maintain an action therefor against the promisor. *A fortiori* is this the case where the person receiving the money or personalty subsequently promises the third party to deliver it to him." ( *Wynn's Administrator* v. *Wood et al.*, 97 Pa. St. 216, and cases there cited.)   Wood on Statute of Frauds says the soundness of the doctrine in the above case cannot be questioned. We have been unable to find an authority in conflict with the authorities herein cited.

In consideration of the above authorities, and the reason of the rules and legal principles therein determined, and those rules and principles being applicable to the facts of the case at bar, we hold that the defendant is liable in this action.

Counsel for respondent argues in support of the judgment that the proofs do not correspond with the allegations of the complaint. The theory of the pleader was that under the facts and circumstances of the case the defendant was the purchaser of the plaintiff's hay, and the appellant by his counsel cites a great many authorities in support of that theory. As to the correctness of this theory, it is not necessary and we do not pass upon it. During the progress of the trial it was not considered that there was anything in the complaint restricting the field of inquiry into the several agreements and transactions on the part of the three actors in reference to the hay bought and sold and the liability or non-liability of the defendant thereunder.   If there be a variance between the allegations of the complaint and the proofs, it is such that an amendment of the complaint could properly have been made if such objection had been taken at the trial.

The judgment and order appealed from are reversed.

BELKNAP, J.:   I concur.

BIGELOW, C. J., being disqualified under the statutes, did not participate in the decision.